**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

**LARRY D'AMBROSIO
d/b/a WESTERN CONTRACTORS,**

        **Plaintiff,**

  v.                                       **6:12-cv-1895
                                                         (NAM/TWD)**

**BAST HATFIELD, INC.
MICHAEL SALISBURY - Project Manager,
AJ LOMNES - Vice President,**

        **Defendants.**

---

**APPEARANCES:**

Larry D. Ambrosio
Plaintiff, Pro se

John P. Mastropietro, Esq.
Mastropietro Frade, LLC
63 Franklin Street
Saratoga Springs, New York 12866
For Defendants

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

## MEMORANDUM DECISION AND ORDER

### INTRODUCTION

Defendants Bast Hatfield, Inc., Michael Salisbury and AJ Lomnes move (Dkt. No.8) to dismiss this pro se employment discrimination action on the ground of failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). As explained below, this motion is granted in part and denied in part.

### THE COMPLAINT

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act, as amended, 42

U.S.C. § 2000e et seq. and § 312 of the N.Y. Executive Law and complains of "[u]nequal terms and conditions of employment." Plaintiff claims he is a "minority contractor" and that defendants discriminated against him.

In his pro se complaint, plaintiff sets forth the following factual allegations: On August 30, 2010, plaintiff signed a subcontract with Bast Hatfield "agreeing to being employed in the Warner Homes - SUNY Cobleskill[1] Renovations" in connection with a roofing project. This was a "state contract". The subcontract contained a caveat concerning the applicability of "the laws of the state of New York" and the "waiver of the Plaintiffs [sic] Constitutional Rights [sic] to a Jury Trial". Bast Hatfield, the contractor and plaintiff's employer "was responsible to go to bat for the subcontractor, his employee."

On September 21, 2010, a pre-roofing meeting was held. Plaintiff attended the meeting along with, among others, Sidney Newbold, from the State University Construction Fund ("SUCF"), Mike Salisbury and Paul Terry, from Bast Hatfield, and representatives from the Acrhitecture+ firm. The meeting concerned the "Environmental Conditions", which required the deck to "be completely dry, in order to perform the work." Several changes to the working conditions were made: the roofing material was scheduled for delivery and designated to be placed "outside the normal staging area" and restrictions were made "regarding removal, storage, and new materials". These were "pass-through changes",[2] which would cost plaintiff additional

---

[1]The State University of New York College of Agriculture and Technology at Cobleskill "SUNY Cobleskill" is located in Cobleskill, New York.

[2]The complaint defines "Pass-Through" claims or changes as follows:

On complex construction projects, subcontractors occasionally incur damages directly attributable to a breach by the owner of its contract with a prime contractor.

2

time and money.

"Right from the onset . . . the problem began concerning the serious issue of pass through changes." According to the complaint:

> [T]he owner of SUCF . . . and SUNY Cobleskill . . . were privy to the changes that were contrary to the standard roofing practices and affect the cost and working conditions of the minority business enterprise. The contractor, Bast Hatfield Inc., the prime contractor was responsible to go to bat for the subcontractor, his employee . . . . . When those decisions were made the representative of SUCF and SUNY as well and especially Bast Hatfield had to be aware that these were pass-through changes that would cost additional time and money. When this was not acknowledged then the parties involved once again were not fundamentally fair to the minority business.

On October 4, 2010, "after the delivery and unloading of the roofing materials, the [SUCF] representative Sidney Newbold or Lois McLaughlin (the minority Rep) changed the designated staging area, splitting it into two locations with half of the materials to be moved." Newbold or McLaughlin changed the staging area a third time, making the "area two miles away from the buildings being worked on." To access the staging area, plaintiff had to "drive down RT 7, a major thoroughfare, which forced the fork lift to be stuck in traffic." This cost plaintiff "time and money" because "roofing installations require[] easy access to materials and dumpsters" and "lifting materials on and off the roof requires that the materials be available next to the building."

The location of the staging area also "created a safety issue that [plaintiff] was not made aware of when signing the contract". "In order to get the roofing materials to the designated area .

---

> Although the subcontractor in such cases usually is not in privity of contract with the owner, the subcontractor may nonetheless prosecute a "pass-through claim" for recovery of damages against the owner through the prime contractor. A pass-through claim is allowed in furtherance of the principle that a subcontractor is entitled to enjoy the benefit of its bargain when its subcontract is terminated because the owner has breached its contract with the prime contractor.

Dkt. No.1.

3

. . the forklift had to drive back and forth full of supplies or waste down the same path the students were using rushing back and forth to their classes". As a result, defendants had to hire a "spotter to ensure the safety of the students". The spotter would "alert the fork lift operator to stop lifting the materials above a student's head" whenever a student walked by the job site. This caused plaintiff "a great deal of anxiety and stress" regarding the students' safety and required him to start and stop "30-40 times a day", which "cost more time and created more delays." Defendants, however, "ignored this contentious matter" and treated plaintiff as if "these conditions did not warrant the pass through claims he was obligated to under law." Plaintiff claims that "[t]his attitude was discriminatory and a clear violation of the fairness required under EEOC and state regulations of conduct toward a minority" and that "this is an issue of fundamental fairness on the job."

The changes "in the specifications that were not mentioned in the unconstitutional subcontract agreement" created other hazards. At the beginning of the project, plaintiff was working on "Holmes day care, the campus nursery", when "[a] wind gust rose up" and blew the the debris, which had been "stock piled on the roof," onto the ground where the children routinely played." Plaintiff "tried to secure the debris and then ran down to alert the nursery in case a child could be put in jeopardy." Plaintiff explained in the complaint that this happened because:

> The stock piled debris cannot be removed fast enough and became a hazard. When uploading material installations they had to be passed over garbage and debris which should not normally be stored on the roof. Then as previous [sic] mentioned the risk of falling debris and roofing supplies lifted above the heads of the students by 10 ton machinery.

This was a "stressful situation" for plaintiff and "Bast Hatfield vice president AJ Lomnes, and SUCF minority coordinator Lois McLaughlin, as well as the architect and site representative

4

should have not allowed students and children to be put anywhere in harm's way.

"Within this framework", defendants also had a "project concerning an elevated side-walk connecting the buildings known as the pedestrian bridge." Defendants "closed the walkway" but left it "open for [plaintiff]". This, plaintiff asserts, "is the absolute positive proof of the clear additional and deliberate policy concerning the stigmatizing of the minority contractor."

On November 23, 2010, plaintiff made a proposal to "speed up the process and make up for time lost due to the weather and changes in "work criteria and circumstances." Plaintiff proposed starting at 3:00 a.m. "to speed up the process and to eliminate the safety issues relating to the students being in harm's way." Plaintiff also proposed "wind netting". Although the "Architectural firm was amiable to this if it was safe and no noise was involved", defendants rejected plaintiff's proposal.

Notes from subsequent project meetings, indicate that there were discussions about "an extension because of weather and the relevant safety issues" and college officials stated that "after the scope of roofing and its possible liability matters that it would be better or preferred a spring installation after the majority of students have left." The officials "requested a no cost extension to the substantial completion date." It had, however, already cost plaintiff "far above what he had agreed to in the subcontract, once all individuals involved apparently lived in denial of the reality of the additional cost." Despite the "reality of the additional cost", defendants "planned to demobilize until spring."

On December 8, 2010, plaintiff began receiving "48 hour threats from the prime contractor" for "being behind schedule." The subcontract required that the "entire project" be finished no later than December 15, 2010. Plaintiff avers that this date was "unrealistic" because

5

the project started late, "weather conditions" slowed progress and "fall/winter procedures takes [sic] twice as long." There had also been at least five rain delays since the project began,[3] which defendants "ignored".

That day, Salisbury, the project manager, "took work away from [plaintiff] . . . gave it to their own contractor" and charged plaintiff more than $10,000. This work had been "specified for the Minority Business Enterprise" and was "once again a pass-through issue". Defendants, however, "ignored their obligation under his minority status" and "their legal obligation of fundamental fairness under" Title VII and the "Due Process Clause."

Plaintiff contacted "the minority Coordinator Lois McLaughlin, for help," but she did not understand "her obligation under law" and failed to investigate his claim.

There was "a complete shut down on December 22, 2010 for winter". Plaintiff asserts that "the contractor refused to grant an extension and blamed" him "for situations that [he] cannot control". Defendants' actions were "not fundamentally fair", deprived him "of his rights" and "discriminatory".

In spring 2011, defendants hired a new project manager to oversee the roofing and charged plaintiff for the project manager's time. This put plaintiff "in a position where he would make no money and suffer serious stigma plus issues that should have been addressed by the Minority representative or another party." "All parties were aware that the treatment of the Minority Business Enterprise was not up to the standard set by both state and federal laws that is the nexus of this issue."

On May 16, 2011, work began again on the roofing project. Plaintiff rented equipment for

---

[3]Plaintiff could not work the day after it had rained, either, if roof surfaces were still wet.

two weeks. Defendants used this equipment but refused to reimburse him. Defendants "blamed the subcontractor for improper installation by the previous sub when [plaintiff] alerted them of the fact." Defendants, however, "rejected claims for additional funds citing the subcontract agreement" and refused "all change orders, reimbursements, cost proposals, then coerced [plaintiff] to sign under duress until the job was finished in September 2011." Defendants "ignored the legal obligation under the law, claiming that he waived all of his rights to claims trying to use section R of the subcontract."A copy of the "supplemental conditions & agreements", which is labeled "R-1", is attached to the complaint.

Plaintiff claims that defendants failed to treat him fairly and discriminated against him. Although the complaint cites Title VII, it also contains allegations that defendants violated his due process and equal protection rights. Additionally, the complaint advances a action relating to "the Human Right's Agency determination" that he was an independent contractor and not an employee. Plaintiff seeks an injunction against the New York State Division of Human Rights[4] and an award of compensatory and punitive damages.

Defendants seek dismissal of the complaint on the ground that Title VII does not protect plaintiff in this case because he was an independent contractor and not an employee. Defendants assert that the complaint fails to state a plausible discrimination claim because it does not allege any facts which indicate that they discriminated against plaintiff. Finally, defendants seek

---

[4]Even if plaintiff had named the Division of Human Rights as a defendant in this case, which he has not, any civil rights claims he advanced against it would be barred by the Eleventh Amendment. *See Baba v. Japan Travel Bureau Int'l. Inc*., 111 F.3d 2, 5 (2d Cir.1997) ( per curiam ) (affirming dismissal on Eleventh Amendment grounds of plaintiff's claims against state Division of Human Rights for its administrative determination regarding her dismissal from employment).

7

dismissal of all claims against individual defendants Salisbury and Lomnes.

## DISMISSAL - Rule 12(b)(6)

To survive a dismissal motion, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'n, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See ATSI*, 493 F.3d at 98. A complaint should be "especially liberally construed when it is submitted *pro se* and alleges civil rights violations." *See Jacobs v. Mostow*, 271 Fed.Appx. 85, 87 (2d Cir. 2008) (citing *Fernandez v. Chertoff*, 471 F.3d 45, 51 (2d Cir. 2006)). The submissions of a *pro se* litigant should be interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citations omitted).

The Court "should not dismiss [a pro se complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Leave to amend is not, however, necessary when amendment would be futile, as when the complaint, even read liberally, does not "suggest[] that the plaintiff has a claim that [he] has inadequately or inartfully pleaded and that [he] should therefore be given a chance to reframe." *Id*.

## Title VII

Title VII makes it unlawful for an employer, inter alia: "to discriminate against any

8

individual because of his race ... in admission to, or employment in, any program established to provide apprenticeship or other training." 42 U.S.C. § 2000e-2(d). To prevail on a Title VII discrimination claim, a plaintiff must ultimately prove that "(1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005). At the pleading stage, a plaintiff need not establish a prima facie case satisfying the required elements of discrimination, but only sufficient facts to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008).[5]

Title VII, by its terms, applies only to "employees," 42 U.S.C. § 2000e(f), but the statute defines an employee as "an individual employed by an employer." *Id*. In *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318 (1992), the Supreme Court ruled that the definitions of "employee," "employer," and "employment" are to be determined under the common law of agency, rather than individual state law, whenever statutes failed to specifically define "employee." *Id*. at 323. Courts have adopted the reasoning in *Darden* to apply the common-law agency test to Title VII and other employment discrimination statutes. *See O'Connor v. Davis*, 126

---

[5]Discrimination and retaliation claims brought under the NYSHRL, § 1981, and the Equal Protection Clause of the Fourteenth Amendment are subject to the same analysis as Title VII claims. *See Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997) ("claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII"); *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) (the burden shifting framework of *McDonnell Douglas* applies to equal protection claims); *Philippeaux v. N. Cent. Bronx Hosp.*, 871 F.Supp. 640, 654 (S.D.N.Y. 1994) (section 1981 claims are evaluated in the same manner as a Title VII claim).

F.3d 112, 115 (2d Cir.1997) (Title VII); *see also Scott v. Massachusetts Mut. Life Ins. Co.*, 86 N.Y.2d 429, 433-34 (1995) (N.Y.HRL) (looking to the control test, among other factors, to determine the nature of the employment relationship). To determine whether an individual is an employee or an independent contractor, a court must consider a non-exhaustive list of factors:

> [1] the hiring party's right to control the manner and means by which the product is accomplished ... [;][2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989) (footnotes omitted); *accord Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113-114 (2d Cir. 2000). Although no one factor is dispositive, *see Reid*, 490 U.S. at 752, "the greatest emphasis should be placed on the first factor-that is, on the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks," *Eisenberg*, 237 F.3d at 114 (internal quotation marks omitted).

Although plaintiff refers to his status as a subcontractor in the complaint, he also states that defendants "employed" him to work on the roofing project at SUNY Cobleskill and maintains that he was defendants' employee. Accepting his allegations as true, the Court finds plaintiff has stated enough facts at this stage of the litigation to make the claim that he is entitled to the protections of Title VII, plausible. Further, the allegations that plaintiff is a minority, that he was employed to work on a roofing project, that defendants adversely changed the terms and conditions of his employment, and refused to pay him for the work he performed, all on the basis

10

of his minority status, are sufficient to survive a motion to dismiss. Accordingly, defendants' motion to dismiss is denied.

## Individual Defendants

Defendants Salisbury and Lomnes seek dismissal of the Title VII claims against them as well as all other legal claims the complaint advances against them. Construed liberally, in addition to Title VII, the complaint suggests an employment discrimination claim under 42 U.S.C. § 1981 and Fourteenth Amendment equal protection and due process claims under 42 U.S.C. § 1983.

## Title VII - Individual Liability

There is no individual liability under Title VII. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Briggs v. New York State Dept. of Transp.*, 233 F.Supp.2d 367, 373 (N.D.N.Y. 2002) (collecting cases). Accordingly, defendants' motion is granted.

## 42 U.S.C. § 1981

As defendants acknowledge in their brief, plaintiff's complaint "is replete with allegations sounding in breach of contract". Construing plaintiff's complaint to raise the strongest claims it suggests, the Court finds plaintiff may be attempting to assert a claim pursuant to 42 U.S.C. § 1981. Section 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). To successfully plead a § 1981 claim, a plaintiff must show: "(1) that []he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 41–42 (2d Cir. 2012) cert. denied, 133 S.Ct. 527 (2012) (quoting *Lauture v. Int'l Bus. Machines Corp.*, 216

F.3d 258, 261 (2d Cir. 2000)). Unlike Title VII, "individuals may be held liable under § 1981." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).

To sustain a claim of individual liability under §1981, a plaintiff "must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.'" *Whidbee*, 223 F.3d at 75 (internal quotation marks omitted). Personal involvement "includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004).

Here, plaintiff has alleged the personal involvement of both Salisbury and Lomnes in discriminating against him regarding the terms and conditions of his contract with Bast Hatfield, on the basis of his race. Plaintiff claims that Salisbury was involved in the project meetings where the terms and conditions of the contract were changed and that Lomnes was aware of these issues but declined to pay the "pass through claims" plaintiff was entitled to as a result of the changes, all on the basis of his minority status. Accordingly, defendants' motion to dismiss all claims as against the individual defendants, is denied.

## 42 U.S.C. § 1983
## Equal Protection and Due Process

The complaint advances claims that defendants violated plaintiff's Fourteenth Amendment equal protection and procedural due process rights. Such claims are brought pursuant to 42 U.S.C. § 1983. As a preliminary matter, the Fourteenth Amendment's equal protection and due process

12

provisions apply only to the acts of states. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 837 (1982) ("[T]he Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities."). Read liberally, plaintiff's submissions suggest that his Fourteenth Amendment claims arise from the alleged contractual relationship between defendants and SUNY Cobleskill, a state university. A contractual relationship, however, is insufficient to establish that Bast Hatfield or the individual defendants are state actors. *See Brooks v. SecurusTech.net*, No. 13-CV-4646, 2014 WL 737683, at *6 (E.D.N.Y. Feb. 24, 2014) ("SecurusTech.net is not a state actor, or acting under color of state law, merely by virtue of its public contract with the Suffolk Jail."); *Rendell–Baker*, 457 U.S. at 841 ("Acts of ... private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."). Accordingly, plaintiff's Fourteenth Amendment claims are dismissed.

## CONCLUSION

For these reasons, it is

**ORDERED** that defendants' motion to dismiss (Dkt. No.8) plaintiff's Title VII claim is **DENIED**; and it is further

**ORDERED** that defendants' motion to dismiss plaintiff's Title VII claims against defendants Salisbury and Lomnes is **GRANTED** and those claims are **dismissed with prejudice** as repleading would be futile; and it is further

**ORDERED** that defendants' motion to dismiss is **GRANTED** with respect to plaintiff's Fourteenth Amendment claims and those claims are **dismissed without prejudice to repleading**; and it is further

13

**ORDERED** that defendants' motion to dismiss is otherwise **DENIED**; and it is further

**ORDERED** that if plaintiff elects to file an amended complaint with respect to his Fourteenth Amendment claims, he shall do so within 30 days of the date of this Memorandum Decision and Order. Any amended complaint plaintiff files must bear plaintiff's original signature and must contain factual allegations sufficient to demonstrate that a state actor was personally involved in the alleged deprivation of his equal protection and due process rights. Plaintiff's amended complaint, which shall supersede and replace in its entirety the original complaint, must be a complete pleading which sets forth all of the claims that plaintiff wants this Court to consider as a basis for awarding relief herein. If plaintiff elects not to file an amended complaint, the case proceed upon the complaint as construed by this Memorandum Decision and Order; and it is further

ORDERED that the Clerk of the Court shall serve a copy of this Order upon all parties to this case, and Plaintiff shall be served by certified mail, return receipt requested.

**IT IS SO ORDERED.**

Date:   March 31, 2014

*Norman A. Mordue*
Norman A. Mordue
Senior U.S. District Judge

14